# 11-830-pr

## United States Court of Appeals

*for the*

## Second Circuit

RUDOLPH YOUNG,

*Petitioner-Appellee,*

– v. –

JAMES CONWAY,

*Respondent-Appellant.*

_____

A FEDERAL HABEAS CORPUS APPEAL FROM THE UNITED STATES
DISTRICT COURT FOR THE WESTERN DISTRICT OF NEW YORK

## BRIEF FOR PETITIONER-APPELLEE

BRIAN SHIFFRIN, ESQ.
EASTON THOMPSON KASPEREK
    SHIFFRIN, LLP
*Attorneys for Petitioner-Appellee*
16 West Main Street, Suite 243
Rochester, New York 14614
(585) 423-8290

JOHN H. BLUME, ESQ.
Cornell Law School
112 Myron Taylor Hall
Ithaca, New York 14853-4901
(607) 255-1030

# TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

STATEMENT OF ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    A.    The Incident at the Home of Mr. and Mrs. Sykes . . . . . . . . . . . . . . 3

    B.    The Photographic Arrays . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    C.    The Arrest Without Probable Cause and the Lineup . . . . . . . . . . . . 5

    D.    The Indictment and First Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    E.    The Reversal of Petitioner's Conviction . . . . . . . . . . . . . . . . . . . . . 7

    F.    The Independent Source Hearing . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    G.    The Retrial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    H.    Direct Appeal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

          1.    Appellate Division Decision . . . . . . . . . . . . . . . . . . . . . . . 12

          2.    New York Court of Appeals . . . . . . . . . . . . . . . . . . . . . . . . 13

    I.    The Habeas Petition and the Decision of the Court Below . . . . . . . 14

STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

SUMMARY OF THE ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

i

POINT I.   IN THIS CASE IN WHICH THE STATE FAILED TO RAISE A *STONE v. POWELL,* 428 U.S. 465 (1976), BAR TO CONSIDERATION OF THE PETITIONER'S CLAIM AT THE COURT BELOW, THIS COURT CAN AND SHOULD EXERCISE ITS DISCRETION TO REACH THE MERITS OF THE PETITION . . . . . . . . . . . . . . . . . . . . . . . . . 18

    A.   Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

    B.   Where the State Fails to Timely Raise a Non-Jurisdictional Defense or Bar to Review of the Merits of a Habeas Corpus Petition a Court Has Discretion as to Whether to Apply the Defense or Bar . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

    C.   As with All Other Non-Jurisdictional Defenses or Procedural Bars to Habeas Petitions, Habeas Courts Have Discretion to Review Fourth Amendment Violations When the State Fails to Timely Raise a *Stone v. Powell* Bar to the Petition . . . . . . . . . . . . . . . . . . . 24

    D.   This Court Should Review the Merits of Mr. Young's Claim That, as Found by the Court Below, the Admission of the Identification Evidence in this Case Was Contrary to or Involved an Unreasonable Application of Clearly Established Federal Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

POINT II.   THE TRIAL COURT'S DETERMINATION THAT MRS. SYKES HAD A BASIS FOR HER IDENTIFICATION OF PETITIONER INDEPENDENT FROM HIS ILLEGAL ARREST WAS BOTH AN UNREASONABLE APPLICATION OF CLEARLY ESTABLISHED FEDERAL LAW AND AN UNREASONABLE DETERMINATION OF THE FACTS IN LIGHT OF THE EVIDENCE PRESENTED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

    A.   Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

B. The Standard for Reviewing the State Courts' Determination That the In-Court Identification Testimony of Ms. Sykes Was Independent of the Illegal Lineup Identification . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

C. The State Courts' Determination that Mrs. Sykes Possessed an Independent Basis for Her In-Court Identification of Petitioner Was Contrary to Clearly Established Federal Law . . . . . . . . . . . . 39

D. Mr. Young Was Prejudiced by the Improper Admission of Mrs. Sykes' Identification Testimony . . . . . . . . . . . . . . . . . . . . . . . 55

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

# TABLE OF AUTHORITIES

## Federal Cases

*Agard v. Portuondo*, 159 F.3d 98 (2d Cir. 1998) ............................................ 21, 31

*Bell v. Cone*, 535 U.S. 685 (2002) .................................................................. 38, 39

*Boardman v. Estelle*, 957 F.2d 1523 (9th Cir. 1992) ........................................ 26

*Brecht v. Abrahamson*, 507 U.S. 619 (1993) ........................................................ 55

*Carvajal v. Artus*, 633 F.3d 95 (2d Cir. 2011) ..................................................... 23

*Caspari v. Bohlen*, 510 U.S. 383 (1994) ................................................................. 21

*Cook v. Donnelly*, No. 02-CV-6073(VEB),
2009 WL 909637 (W.D.N.Y. March 31, 2009) .................................................... 30

*Crenshaw v. Miller*, No. 02-CV-6623,
2004 WL 1040852 (W.D.N.Y. March 26, 2004) .................................................. 30

*Danforth v. Minnesota*, 552 U.S. 264 (2008) ....................................................... 21

*Davis v. Blackburn*, 803 F.2d 1371 (5th Cir. 1986) ............................................ 27

*Day v. McDonough*, 547 U.S. 198 (2007) ................................................. 20, 21, 23

*Douglas v. Workman*, 560 F.3d 1156 (10th Cir. 2009) ....................................... 15

*Dunnigan v. Keane*, 137 F.3d 117 (2d Cir. 1998) .......................................... 45, 47

*Endress v. Dugger*, 880 F.2d 1244 (11th Cir. 1989) ........................................... 38

*Esslinger v. Davis*, 44 F.3d 1515 (11th Cir. 1999) ............................................. 25

*Fagan v. Washington*, 942 F.2d 1155 (7th Cir. 1991) ......................................... 31

*Falconer v. Lane*, 905 F.2d 1129 (7th Cir. 1990) ................................................. 26

*Fay v. Noia*, 372 U.S. 391 (1963) ........................................................ 24

*Flood v Kuhn*, 407 U.S. 258 ................................................ 23

*Fry v. Pliler*, 551 U.S. 112 (2007) ........................................................ 55

*Gonzalez v. Thaler*, No. 10-895,
 — S. Ct. ----, 2012 WL 43513 (Jan. 10, 2012) ..................................... 24

*Granberry v. Greer*, 481 U.S. 129 (1987) ........................................... passim

*Harmon v. Ryan*, 959 F.2d 1457 (9th Cir. 1992) ................................... 25

*Harrington v. Richter*, 131 S. Ct. 770 (2011) ....................................... 55

*Kennaugh v. Miller*, 150 F. Supp. 2d 421 (E.D.N.Y. 2001) ................... 43

*Manson v. Brathwaite*, 432 U.S. 98 (1977) ........................................... 52

*Miller v. Fenton*, 474 U.S. 104 (1985) .................................................. 38

*Neil v. Biggers*, 409 U.S. 188 (1972) .............................................. 41, 51

*Overton v. Newton*, 295 F.3d 270 (2d Cir. 2002) ................................. 38

*Portuondo v. Agard*, 529 U.S. 61 (2000) ........................................ 22, 31

*Raheem v. Kelly*, 257 F.3d 122 (2d Cir. 2001) .............................. passim

*Ramchair v. Conway*, 601 F.3d 66 (2d Cir. 2010) ................................ 15

*Rubin v. Garvin*, 544 F.3d 461 (2d Cir. 2008) .................................... 15

*Schiro v. Farley*, 510 U.S. 222 (1994) ................................................ 21

v

*Smiley v. Thurmer*, 542 F.3d 574 (7th Cir. 2008) .................................................. 55

*Solomon v. Smith*, 645 F.2d 1179 (2d Cir. 1981) .................................................. 54

*Stone v. Powell*, 428 U.S. 465 (1976) ........................................................... passim

*Sumner v. Mata*, 455 U.S. 591 (1982) .................................................... 37

*Tart v. Massachusetts*, 949 F.2d 490 (1st Cir. 1991) ........................................... 27

*Teague v. Lane*, 489 U.S. 288 (1989) ........................................................ 19, 20, 21

*Thigpen v. Cory*, 804 F.2d 893 (6th Cir. 1986) ..................................................... 43

*Tomlin v. Myers*, 30 F.3d 1235 (9th Cir. 1994) .................................................... 37

*Trest v. Cain*, 522 U.S. 87 (1997) ...................................................... 20

*United States v. Crews*, 445 U.S. 463 (1980) ............................................... passim

*United States v. Gordon*, 156 F.3d 376 (2d Cir. 1998) ......................................... 15

*United States v. Ishmael*, 343 F.3d 741 (5th Cir. 2003) ....................................... 27

*United States v. Male Juvenile*, 121 F.3d 34 (2d Cir. 1997) ................................ 27

*United States v. Vasquez*, 389 F.3d 65 (2d Cir. 1994) .......................................... 38

*United States v. Wade*, 388 U.S. 218 (1967) ................................................. passim

*Wallace v. Duckworth*, 778 F.2d 1215 (7th Cir. 1985) ......................................... 28

*Williams v. Dixon*, 961 F.2d 448 (4th Cir. 1992) ................................................. 26

*Williams v. Taylor*, 529 U.S. 362 (2000) ....................................................... 37, 38

*Withrow v. Williams*, 507 U.S. 680 (1993) ........................................................ 19

*Wong Sun v. United States*, 371 U.S. 471 (1963) ..................................... 16, 39, 40

*Woolery v. Arave*, 8 F.3d 1325 (1993) .......................................................... 28, 29

*Wray v. Johnson*, 202 F.3d 515 (2d Cir. 2000) .................................................. 56

**State Cases**

*People v. Young*, 20 A.D.3d 893 (4th Dept. 2005) ............................................ 12

*People v. Young*, 202 A.D.2d 1024 (4th Dept. 1994) ........................................... 5

*People v. Young*, 255 A.D.2d 905 (4th Dept. 1998) ............................................. 5

*People v. Young*, 7 N.Y.3d 40 (2006) ......................................................... 13, 57

*State v. Delgado*, 902 A.2d 888 (N.J. 2006) ..................................................... 54

*State v. Henderson*, 208 N.J. 208, 27 A.3d 872 (N.J. 2011) ............................... 54

**Federal Constitution and Statutes**

28 U.S.C. § 2253(c) ......................................................................................... 24

28 U.S.C. § 2254 .............................................................................................. 57

28 U.S.C. 2254(b) ............................................................................................ 23

28 U.S.C. § 2254(d) ................................................................................... 38, 41

Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104–132, § 104, 110 Stat. 1214, 1219 (1996) ("AEDPA") .......................................... passim

United States Constitution, Fourth Amendment ......................................... passim

## Federal Court Rules

Federal Rules of Civil Procedure Rules 59(e) ........................................................ 30

Federal Rules of Civil Procedure Rules 60(b) ....................................................... 30

Rules Governing Section 2254 Cases in the United States District Courts 5(B) . 30

## Other Authorities

Charles A. Morgan III et al., Accuracy of Eyewitness Memory for
Persons Encountered During Exposure to Highly Intense Stress,
27 Int'l J.L. & Psychiatry 265 (2004) ................................................................ 43

Cynthia L. Ogden, et al., Centers for Disease Control, *Mean Body Weight,
Height, and Body Mass Index, United States, 1960-2002* (2004) ........................ 47

Elizabeth Loftus, *Semantic Integration of Verbal Information into a Visual
Memory,* 4 J. Experimental Psych.: Hum. Learning And Memory 19-31 (1978)   53

Elizabeth Loftus & Hunter G. Hoffman, *Misinformation and Memory: The
Creation of New Memories*, J. Experimental Psychol., 118 J. Experimental
Psychol. 100 ........................................................................................................ 46

Gary L. Wells & Deah S. Quinlivan, *Suggestive Eyewitness Identification
Procedures and the Supreme Court's Reliability Test in Light of Eyewitness
Science: 30 Years Later*, 33 Law & Hum. Behav. 1 (2009) ................................. 54

http://wwvv.cde.gov/nchs/data/ad/ad347.pdf ...................................................... 47

Kenneth A. Deffenbacher et al., A Meta-Analytic Review of the Effects of High
Stress on Eyewitness Memory, 28 Law & Hum. Behav. 687 (2004) .................. 43

Kenneth A. Deffenbacher et al., Mugshot Exposure Effects: Retroactive
Interference, Mugshot Commitment, Source Confusion, and Unconscious
Transference, 30 Law & Hum. Behav. 287, 299 (2006) ....................................... 46

Kenneth A. Deffenbacher, Eyewitness Accuracy and Confidence: Can We Infer Anything about Their Relationship? 4 Law & Hum. Behav. 243-60 (1980) ....... 53

Laurie Gould et al., *Reforming the Use of Eyewitness Testimony*, 3 5 Okla. City U. L. Rev. 131 (2010) ..................................................................... 54

Sandra Guerra Thompson, *Judicial Blindness to Eyewitness Misidentification,* 93 Marq. L. Rev. 639 (2009) ..................................................................... 54

## STATEMENT OF ISSUES

1.  Whether this Court should excuse the State's failure to raise a non-jurisdictional bar or defense, i.e., *Stone v. Powell*, 428 U.S. 465 (1976) at any prior point in the proceedings, and thus refuse to consider the merits of Petitioner's claim that a conceded violation of the Fourth Amendment produced a contaminated and unreliable eyewitness identification?

2.  Whether the state courts' determination that the eyewitness, Lisa Sykes, had a basis for her identification of Petitioner independent from his illegal arrest was both an unreasonable application of clearly established law and an unreasonable determination of the facts in light of the evidence presented where:

(1) Sykes had a limited opportunity to view the intruder's face which had been mostly covered by a scarf and was thus unable to assist in the preparation of a composite drawing;

(2) there were discrepancies between Sykes' pre-lineup description of the intruder and the Petitioner's age and height;

(3) Sykes was unable to select Petitioner's photograph from the array she viewed prior to the illegal arrest and she testified that she had selected a different person's photograph;

(4) Sykes admitted that her ability to identify Petitioner was based solely on his

1

eyes, which she had testified were not unusual, and the voice she heard at the illegal lineup; and

(5) Sykes' first in-court identification of Petitioner occurred over a year after the incident; that identification was explicitly based on the concededly illegal lineup;

(6) eight years passed between the incident and Sykes' identification of Petitioner at the independent source hearing?

## STATEMENT OF FACTS

### A.    The Incident at the Home of Mr. and Mrs. Sykes

On the evening of March 29, 1991, an intruder entered the home of William and Lisa Sykes (Appendix (A) 112-16). This intruder wore a blanket "draped over his clothes." (A131.) He also wore a scarf "wrapped around his mouth" that covered his lips, nose, ears, and cheeks, leaving only his eyes uncovered (A136-37). During the "five to seven" minutes the intruder was in the Sykes residence, the scarf always covered the intruder's face (A124, 136-38).

When he entered the living room, the intruder carried an axe and sledgehammer, both of which belonged to the Sykes (A117, 119). The intruder threatened the couple with the axe and ordered them to give him their wallets (A118-19). The intruder took money from their wallets and purse, some loose change, and "some watches" from a container in the bedroom dresser[1] (A121).

Mrs. Sykes was able to tell that the intruder was a male (A122). With the scarf covering a majority of the man's cheeks, jawbone and ears, the only parts of his face that she could see were his forehead, eyebrows, and eyes (A136-39). But, as she later told the police, there was "[n]othing unusual that stood out" about his eyes, and she

---

[1]    The couple later discovered that a pair of binoculars, a red bicycle, a mirror, and a pair of "workout gloves that were in [Mrs. Sykes'] car" were also missing (1993 Trial Transcript (Trial I), 48-49).

3

also did not notice anything "unusual" about the intruder's eyebrows or forehead (A140). She also acknowledged that she screamed when she saw the intruder, and that she was "scared" and "petrified." (A142.)

Mrs. Sykes "called the police immediately" after the intruder left (A125). Officers of the Brighton Police Department arrived shortly thereafter and asked both Mr. and Mrs. Sykes for any kind of description of the intruder. In the police report taken that evening, which she signed, Mrs. Sykes, who is white, only described the perpetrator as "[a] black man in his twenties, five-ten, medium build." (A131, 175; Trial I, 71-72.) The police asked her if she could assist the attending police officers in preparing a composite sketch of the intruder; she declined, stating "I don't think I can." (A131.)

At no point during the home invasion did either Mr. or Mrs. Sykes observe or identify the intruder's forehead, head or facial hair (assuming he had any), shoes, pants, or whether the intruder wore a hat, or gloves (A134-39). Indeed, Mrs. Sykes did not "pay attention to" the type or color of the intruder's pants or the length of the intruder's arms, or even whether the blanket covered up his legs at all (A134-35). She also did not notice whether the intruder bore any noticeable distinct physical characteristics, such as a scar or tattoo, or whether the intruder wore any jewelry on any of his fingers (A138-40). Mrs. Sykes would later explain that she did not pay

4

attention to these details because she was "looking at his eyes"—eyes that she acknowledged were not in any way "unusual" or "stood out." (A140.)

## B.  The Photographic Arrays

On April 25, 1991—twenty-seven days after the incident—police showed Mrs. Sykes a photographic array containing six full-color photographs, one of which was of the Petitioner's entire face. At a hearing held on April 30, 1991, Mrs. Sykes admitted that she selected someone other than the Petitioner from the photo array (A155-56).[2] On April 26, 1991, the police came to the Sykes' home around midnight and showed the exact same photo array to Mr. Sykes. Mrs. Sykes was also present. Mr. Sykes was unable to identify Petitioner or anyone else in the array as the perpetrator (A156-57).

## C.  The Arrest Without Probable Cause and the Lineup

On April 27, 1991, Petitioner was unlawfully arrested.[3] The same day, Mr. and Mrs. Sykes separately observed a six-man lineup that included Petitioner. Of the

---

[2] At a hearing eight years later, Ms. Sykes modified her account of the photo array and asserted, despite her contemporaneous testimony to the contrary, that she did not pick out anyone when viewing the photo array (A126-127).

[3] The Appellate Division subsequently held that there was no probable cause for the arrest. *People v. Young*, 202 A.D.2d 1024, 1024 (4th Dept. 1994) (A89-90) (Contrary to the assertion at pages 2-3 of Appellant's brief, this was not an appeal from a conviction for the crimes which are the subject of the Petition, although the decision dealt with this arrest); *People v. Young*, 255 A.D.2d 905, 905 (4th Dept. 1998) (A91).

lineup participants, Petitioner was the only person whose picture had been included in the photo array viewed by the Sykes (Suppression Hearing, January 22, 1991 (Suppression Hr'g), 218–19). Each of the lineup participants stepped forward and said "three things" that the intruder had allegedly said during the incident (Trial I, 56–57). Unlike the intruder that Mr. and Mrs. Sykes actually observed during the March 29 incident, the six participants in the lineup did not wear scarves around their faces or blankets around their torsos—their hair, scalp, ears, cheeks, arms, and build were visible (A159-160).  Mr. Sykes did not identify Petitioner (Trial I, 91); instead, Mr. Sykes concluded that the voice of participant #1 sounded most like the intruder while, on the other hand, the eyes and face of participant #5 most resembled the intruder (Trial I, 91). Petitioner was neither participant #1 nor participant #5. Then, Mrs. Sykes made a positive identification of Petitioner based "just [on] his eyes and the voice." (A161.)[4]

###    D.    The Indictment and First Trial

A Monroe County grand jury indicted Petitioner on two counts of robbery in the first degree and burglary in the first degree in violation of New York penal law

---

[4]  As noted previously, Ms. Sykes described the intruder to the police as being a black male, mid-twenties and approximately 5 feet ten inches tall.  Petitioner is six feet tall, and was almost thirty-four years old at the time of the identification procedure (Suppression Hr'g 156).

6

(Indictment No. 402/91). At Petitioner's jury trial in August 1993, Mrs. Sykes identified Petitioner as "that person that [she] identified at the lineup." (Trial I, 57.) She testified that she made this identification on a "combination" of factors "from seeing him and also the voice." (A73.) Due largely to Mrs. Sykes' in-court identification of Petitioner from the prior lineup, Petitioner was convicted (A89-90).

### E.      The Reversal of Petitioner's Conviction

On appeal, the Appellate Division, Fourth Department, unanimously reversed Petitioner's conviction (A91). Noting its previous unanimous ruling that there had not been probable cause for Petitioner's arrest (A89-90), the court held that "[b]ecause police obtained [Petitioner's] consent to the line-up by means affected by the primary taint of his illegal arrest, it must be concluded that the [in-court] line-up identification flowed directly from the illegal arrest and was not attenuated therefrom." (A91.) The court ordered a new trial, but provided the prosecution with an opportunity to prove that Mrs. Sykes' in-court identification of the Petitioner had "a basis independent of the unlawful arrest and tainted identification procedure." (A91.)

### F.      The Independent Source Hearing

On March 11, 1999—eight years after the initial incident at the Sykes' residence—an independent source hearing was conducted to determine whether Mrs. Sykes would be permitted to make an in-court identification of Petitioner at a re-trial.

Mrs. Sykes was the only witness to testify at that hearing,

Mrs. Sykes' testimony essentially mirrored her prior testimony in the matter: the intruder had a "[s]carf over his face and a blanket covering all his clothes," (A131); the scarf "covered up the intruder's mouth and chin", and ears, the "majority of the intruder's cheeks and jawbone," (A136-38); she did not recall whether the intruder had a beard or a mustache or the length or kind of hair on his head, (A138-39), or even whether he wore a hat, (A143-44); she did not remember whether the intruder wore any jewelry such as a watch or bracelet, (A141); she did not remember what type of shoes the intruder had on, (A141), and she could not describe the pants he had on (A143-44); she did not know whether he had on a jacket underneath the blanket or was wearing gloves (A132); she also did not know whether the intruder was muscular or had any "noticeable or distinct physical characteristics", (A138); rather, she was primarily "looking at" and "concentrating on" the intruder's eyes, but there was "[n]othing unusual that stood out" about them. (A140.)

She acknowledged that almost immediately after the incident she was asked whether she would be willing to assist the Brighton Police Department in sketching a composite drawing of the intruder's face, and that she had declined, responding, "I don't think I can." (A131.) While she claimed that she told the police that the intruder was in the his late twenties and was light black in color (A125), she admitted that the

official police report that she signed on the night of the incident (A175) shows that she was only able to describe the intruder as "[a] black man in his twenties, five-ten, medium build." (A131). Mrs. Sykes explained that although she looked at the eyes of each of the photographs in the array, she could not pick out Petitioner's color photograph in the photo array because "a photograph is not a real person" and the pictures in the array do not "look real" to her (A155).

Mrs. Sykes further testified that at the lineup she picked out Young based just on his eyes and voice (A161). She contended that, eight years after the incident, she could "completely excise that lineup from [her] mind" and make an in-person identification based on solely on the "eyes and voice." (A168.)

Based on this testimony, the hearing court found that Mrs. Sykes "did demonstrate the ability to make an in-court identification" at Petitioner's subsequent retrial (Minutes of May 4, 1998, 11). The court stressed that Mrs. Sykes "was in close proximity" to the intruder and "had ample opportunity" to see him. Admitting that "much of her identification focused on [the intruder's] eyes," the court nonetheless found that Mrs. Sykes' certainty of her ability to identify Petitioner established an ability to make an in-court identification (Minutes of May 4, 1998, 11).

## G. The Retrial

In January 2000, Petitioner was retried on the robbery and burglary charges

stemming from the incident at the Sykes residence that occurred March 29, 1991. Mrs. Sykes identified Petitioner as the perpetrator. (January 2000 Trial Transcript (Trial II), 46). Mr. Sykes described the incident, but he was unable to identify Petitioner as the perpetrator. In addition to the Sykes, the prosecution called two other witnesses, Taunja Isaac and Nell Kimbrel, in an effort to link Petitioner to the charged crimes.

Taunja Isaac testified that sometime in March or April of 1991, Petitioner had "asked [her] to sell" certain items that the Sykes identified as taken from their home (Trial II, 99-100, 130-33). However, the probative value of this evidence was diminished by the fact that the items were found by the police during Isaac's arrest for three counts of disorderly conduct (Trial II, 180). Ms. Isaac, who was a predicate felon with a lengthy criminal record, was never charged with possession of this stolen property (Trial II, 173-203). She claimed that at the time of her arrest was afraid that she was going to be charged and be sent to jail (Trial II, 185-86). Moreover, Ms. Isaac admitted that she "had a very good and close friendship" with Lamont Gordon, a man who "lived around [her] neighborhood" and who Ms. Isaac saw "every day." (Trial II, 149-50.) Ms. Isaac knew that the police were investigating Mr. Gordon, a [l]ight skinned" African-American male who was about "about six feet," of "medium build," and "between 18 and 20" at the time of the incident (Trial II, 159), with a prior

10

criminal record, as a suspect in the Sykes robbery (Trial II, 187).

Nell Kimbrel testified that on April 29, 1991, the Brighton police found a pair of gloves belonging to Mr. and Mrs. Sykes in a garbage can at her apartment (Trial II, 253-58). Ms. Kimbrel could only say that the gloves "had been in [her] house for awhile" and that she had never "actually seen" Petitioner with the gloves (Trial II, 261). Indeed, Ms. Kimbrel testified that as many as "30 people a night" from the general neighborhood used to either "stay [at Ms. Kimbrel's residence] overnight" or "be in and out" at night to "smoke cocaine." (Trial II, 272-73.) Ms. Kimbrel—who was "constantly [and] continually" using cocaine in March and April of 1991—testified that "[a]t any point someone could have brought the gloves in [to her house] because [she] had a lot of peoples in the house." (Trial II, 274, 285-86.) Ms. Kimbrel, who had a prior record for larceny and possession of stolen property, testified that during March and April 2001, Ms. Isaac was coming to her house frequently because Kimbrel was buying cocaine from Isaac and they would use it together (Trial II, 275-77).[5]

---

[5] The prosecution offered no physical evidence that in any way linked Petitioner to the March 29, 1991 incident at the Sykes residence. Patrick Crough, a Monroe County Sheriff's Office Investigator, admitted that he "didn't see where Taunja Isaac got [the] binoculars from," and never directed Ms. Isaac to "show [him] where she had gotten" them or "who she had gotten them from." (Trial II, 244.) Thomas Schrader, a retired investigator formerly of the Brighton Police Department, testified that a warranted search of Petitioner's then-residence revealed none of the Sykes'

The Court refused to permit Petitioner to introduce expert testimony on the ability of a person to make an identification independent of a tainted previous identification, and the ability of a person to make an accurate identification given various factors, such as the assailant's face being covered, the long passage of time between the observation and the identification, the stressful circumstances of the observation, and the "cross-racial" nature of the identification (Trial II, 307-25, 363).

Petitioner was convicted of all three counts contained in the indictment and sentenced to two consecutive terms of fifteen years to life imprisonment (Sentencing Minutes 44–46).

## H. Direct Appeal

### 1. Appellate Division Decision

With two justices dissenting, the Appellate Division, Fourth Department affirmed Petitioner's conviction on appeal. *People v. Young*, 20 A.D.3d 893, 893 (4th Dept. 2005) (A198-99). As for Petitioner's challenge to Mrs. Sykes' in-court identification, the majority held that the "Supreme Court properly determined that the People proved by clear and convincing evidence that the victim had an independent

---

missing property (Trial II, 295-96). The fingerprint technician who had responded to the Sykes residence on the night the incident occurred testified to having "looked at [the property] for any potential fingerprints" but retrieving "no latent fingerprint evidence" from the axe, the sledgehammer, the utility knife, furniture in the Sykes' residence, or the interior of the Sykes' automobile. (Trial II, 222-28).

basis for her in-court identification" of Petitioner (A198). After noting that one of the victims of the incident, William Sykes, was unable to render any identification at all, the dissenting justices believed that there was no independent source based on the following factors: (1) Mrs. Sykes testified "she could see only his forehead, eyebrows, eyes and that part of his nose above the scarf" and "that there were no distinguishing characteristics with respect to the intruder's forehead, eyebrows and eyes;" (2) Mrs. Sykes was unable to "assist the police in constructing a composite of the intruder;" and (3) Mrs. Sykes did not select Petitioner "from a photo array one month after the crime despite looking into the eyes of each man." (A199.) As a result, the dissenting justices concluded that "any in-court identification testimony by the victim would be derived from exploitation" of Petitioner's illegal arrest prior to his inclusion in the "irrevocably tainted" six-man lineup on April 27, 1991 (A199).

## 2. New York Court of Appeals

A divided panel of the Court of Appeals of New York affirmed. *People v. Young*, 7 N.Y.3d 40, 46 (2006) (A201-05). The majority declined to "disturb" the holding that there was an independent basis for Mrs. Sykes' identification testimony because this was "an issue of fact" resolved adversely to Petitioner by the courts below (A202). Judge G.B. Smith dissented, concluding that "any in-court identification [was] impermissible as a matter of law." (A204.)

13

### I.     The Habeas Petition and the Decision of the Court Below

Mr. Young timely filed a petition for a writ of habeas corpus which alleged, *inter alia*, that the conclusion of the state courts that Mrs. Sykes had an independent source for her in-court identification of Petitioner was contrary to and an unreasonable application of clearly established federal law (A6-40, 57-64). The State filed an Answer, but neither in the Answer nor in any subsequent filing did the State make the argument on which it rests its entire case in this Court, i.e., that *Stone v. Powell*, 428 U.S. 465 (1976), bars consideration of Petitioner's claim.

Magistrate Bianchini granted the Petition to the extent that relief was "granted on the claim that the victim's identification was admitted in violation of [Petitioner's] constitutional rights." (A87.) The court ordered that the conviction for these offenses be vacated because without the improperly admitted testimony of Mrs. Sykes "the remaining proof does not provide a legally sufficient basis for conviction as matter of law." (A87.) The court's reasons for granting this claim are set forth in the Court's decision at A81-83, and are discussed in detail at Point II(C), *infra*. The remaining claims in the petition were denied (A87).

14

## STANDARD OF REVIEW

In an appeal of a decision in a habeas corpus proceeding, this Court reviews the district court's grant or denial of habeas corpus *de novo*; the review of the underlying findings of fact is for clear error; and the review of the district court's choice of a habeas remedy is for an abuse of discretion. *Ramchair v. Conway*, 601 F.3d 66, 72 (2d Cir. 2010) (citing *Rubin v. Garvin*, 544 F.3d 461, 467 (2d Cir. 2008); *United States v. Gordon*, 156 F.3d 376, 381 (2d Cir. 1998); *Douglas v. Workman*, 560 F.3d 1156, 1176 (10th Cir. 2009)).

## SUMMARY OF ARGUMENT

The Magistrate Judge was correct in granting Mr. Young's petition because the state court rulings permitting admission of the in-court identification testimony of Mrs. Sykes at Petitioner's retrial, after the lineup had been suppressed as a product of an arrest without probable cause, were contrary to or failed to reasonably apply the holdings in *United States v. Crews*, 445 U.S. 463 (1980), *United States v. Wade*, 388 U.S. 218 (1967), and *Wong Sun v. United States*, 371 U.S. 471 (1963).

At the independent source hearing, the testimony revealed that Mrs. Sykes' (1) had a limited opportunity to view the perpetrator's face, which had been covered by a scarf; (2) had been unable to assist in the preparation of a composite drawing; (3) gave a general description of the perpetrator which varied from that of the Petitioner; (4) was unable to select Petitioner's photograph from the array she viewed prior to the illegal arrest; (5) may have selected another person's photograph; and (6) acknowledged that her ability to identify Petitioner was based solely on his (admittedly not unusual) eyes and the voice she heard at the illegal lineup. Additionally, more than one year elapsed between the incident and the first trial where her testimony was explicitly based on the lineup and more than eight years between the incident and independent source hearing. Thus, none of the factors set forth in *Wade* and *Crews* for determining the admissibility of in-court identification

16

testimony after an illegally conducted lineup weighed in favor of finding that there was an independent basis for Mrs. Sykes' identification of Petitioner at his retrial.

On appeal, the State makes no argument to the contrary. Instead, the State argues, for the first time, that *Stone v. Powell*, 428 U.S. 465 (1976), bars consideration of this claim. As with all other non-jurisdictional defenses or procedural bars to habeas petitions, habeas courts have discretion to review Fourth Amendment violations when the state fails to timely raise a *Stone* bar to the petition. Given the failure to raise the *Stone* bar at the court below, the state courts' undisputed finding that Petitioner was arrested without probable cause, the failure of the State to establish a source for this identification evidence independent of the illegal arrest, the unreliable nature of the identification evidence at issue, and the absence of reliable evidence that Petitioner committed the charged crimes, this Court can and should refuse to exercise this discretion to apply the *Stone* bar and should, instead, affirm the grant of the Petition.

17

**POINT I: IN THIS CASE IN WHICH THE STATE FAILED TO RAISE A *STONE v. POWELL,* 428 U.S. 465 (1976), BAR TO CONSIDERATION OF THE PETITIONER'S CLAIM AT THE COURT BELOW, THIS COURT CAN AND SHOULD EXERCISE ITS DISCRETION TO REACH THE MERITS OF THE PETITION.**

## A.   Introduction

Petitioner claimed (A7, 12-23, 57-64) and the Court below held (A80-83, 87) that the state courts unreasonably applied Supreme Court precedent when they determined that there was an independent basis for the admission of Mrs. Sykes' in-court identification of Petitioner. Despite the fact that it was crystal clear that the underlying constitutional claim that gave rise to the identification procedure at issue was that Petitioner was arrested without probable cause, the State never argued directly or indirectly that the rule announced in *Stone v. Powell*, 428 U.S. 465 (1976), barred consideration of Petitioner's claim. Instead, it joined issue on the merits, arguing that the state courts properly held that there was an independent basis for the admission of Mrs. Sykes' identification testimony (A41-47; Mem. Law Supp. Answer). On appeal, the State has taken a completely new and different approach. It argues, for the first time, that Petitioner should lose because the underlying constitutional violation at issue in this proceeding is a Fourth Amendment violation as to which *Stone* precludes review (Appellant's Brief 8-11). The Appellant's Brief

18

never even mentions its failure to raise this issue at District Court and never discusses the consequences of this failure.

The holding in *Stone* that "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial" is expressly not a jurisdictional bar to consideration of such claims. *Stone*, 428 U.S. at 494 n.37; *Withrow v. Williams*, 507 U.S. 680, 686 (1993) ("We have made it clear that *Stone*'s limitation on federal habeas relief was not jurisdictional in nature . . . ."). Rather, the Court explained that "we hold only that a federal court need not apply the exclusionary rule on habeas review of a Fourth Amendment claim absent a showing that the state prisoner was denied an opportunity for a full and fair litigation of that claim at trial and on direct review. Our decision does not mean that the federal court lacks jurisdiction over such a claim." *Stone*, 428 U.S. at 494 n.37.

*Stone* does not address the consequence of a state's failure to raise a *Stone* defense to a petition raising a Fourth Amendment issue. Nor has the Supreme Court subsequently addressed this specific issue. As detailed below, however, on the analogous issues of the failure of a State to raise procedural default, exhaustion, or *Teague v. Lane*, 489 U.S. 288 (1989) defenses, the Supreme Court has repeatedly

19

held that such non-jurisdictional defenses can be waived by the failure of the State to have timely raised them. In such circumstances, Courts of Appeals have discretion, but are by no means required, to address the defenses or defaults raised for the first time on appeal. Thus, as detailed below, three of the four courts of appeals to consider the issue as to *Stone* claim waivers, have held, that, like other failures to raise non-jurisdictional bars, where the State has failed to raise a *Stone* bar in the lower court an appellate court has discretion as to whether to apply the *Stone* equitable bar on appeal. These courts are clearly correct, and given the failure of the State to raise a *Stone* bar in the District Court in this case, the uncontested illegality of Petitioner's arrest, the unreliable nature of the identification evidence, and the absence of reliable evidence that Petitioner committed the charged crimes, *see* Point II, *infra*, this Court can and should refuse to exercise this discretion to apply the *Stone* bar and should, instead, determine the merits of the Petitioner's claim.

**B.  Where the State Fails to Timely Raise a Non-Jurisdictional Defense or Bar to Review of the Merits of a Habeas Corpus Petition a Court Has Discretion as to Whether to Apply the Defense or Bar**

In *Trest v. Cain*, 522 U.S. 87, 89 (1997), the Supreme Court held that a procedural default is an affirmative defense that should be raised by the state and that "[a] court of appeals is not 'required' to raise the issue of procedural default *sua sponte*." Subsequently, in *Day v. McDonough*, 547 U.S. 198 (2007), the Court held

20

that even after the passage of the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104–132, § 104, 110 Stat. 1214, 1219 (1996) ("AEDPA"), federal courts have discretion, but are not required, to consider non-jurisdictional procedural defaults. Specifically, the Court held that where the state fails to raise the AEDPA statute of limitations defense "district courts are permitted, but not obliged, to consider, *sua sponte*, the timeliness of a state prisoner's habeas petition." *Id*. at 209.

Similarly, in considering the effect of a failure of the State to timely raise a non-retroactivity claim pursuant to *Teague v. Lane*, 489 U.S. 288 (1989), the Supreme Court in *Danforth v. Minnesota*, 552 U.S. 264, 289 (2008), held that a state can waive a *Teague* claim by not asserting it in a timely fashion. Previously, in *Caspari v. Bohlen*, 510 U.S. 383 (1994), this waiver was held to mean that "a federal court may, but need not, decline to apply Teague if the State does not argue it." 510 U.S. 383 at 389 (citing *Schiro v. Farley*, 510 U.S. 222, 228-29 (1994)). In *Schiro*, the Court explained that it need not apply the *Teague* bar when not properly raised by the state because "it is not . . . jurisdictional." *Id*. at 228.

Applying *Caspari,* this Court held that "*Teague* itself is driven by comity[,] [b]ut comity also calls for representatives of states not to agree to federal courts expending substantial time in addressing the merits of a case, only to argue belatedly that the merits should not have been reached." *Agard v. Portuondo*, 159 F.3d 98, 100

21

(2d Cir. 1998), *rev'd on other grounds*, 529 U.S. 61 (2000).

As with procedural defaults and *Teague* claims, the Supreme Court has held that the non-jurisdictional defense of failure to exhaust may, but need not, be considered by courts if not timely raised by the state. *Granberry v. Greer*, 481 U.S. 129 (1987). In *Granberry*, which was decided prior to AEDPA, the Supreme Court rejected the contentions that upon the state's failure to raise an exhaustion defense where there was non-exhaustion of the claim in state court, that either the state should always be precluded from raising the exhaustion defense or, conversely, that courts should always be precluded from considering the merits of the unexhausted claim. Instead, after pointing out that, as with the *Stone* bar, the exhaustion requirement is not jurisdictional, the Court adopted an "intermediate approach," according to which the courts of appeals are "to exercise discretion in each case to decide whether the administration of justice would be better served by insisting on exhaustion or by reaching the merits of the petition forthwith." *Id*. at 131, 133. As the Court explained

> it seems unwise to adopt a rule that would permit, and might even encourage, the State to seek a favorable ruling on the merits in the district court while holding the exhaustion defense in reserve for use on appeal if necessary. If the habeas petition is meritorious, such a rule would prolong the prisoner's confinement for no other reason than the State's postponement of the exhaustion defense to the appellate level. Moreover, if the court of appeals is convinced that the petition has no

merit, a belated application of the exhaustion rule might simply require useless litigation in the state courts. *Id*. at 132-33.

Subsequent to the *Granberry* decision, the AEDPA was enacted containing a provision (28 U.S.C. 2254(b)(3)) which expressly provides that the "[s]tate shall not be deemed to have waived the exhaustion requirement or be estopped from reliance upon the requirement unless the [s]tate, through counsel, expressly waives the requirement." Thus, with respect to a State's failure to raise the exhaustion requirement, Congress has chosen to limit a court's discretion to find waiver. *Carvajal v. Artus*, 633 F.3d 95, 105 (2d Cir. 2011). Significantly, Congress did not enact a parallel provision holding that an express waiver is required regarding the failure of the State to raise any other defense or bar to review on the merits specifically including the *Stone* rule. Likewise, when acknowledging this *statutory* limitation on a court's ability to find waiver regarding an exhaustion defense, the Supreme Court in *Day v. McDonough*, 547 U.S. 198 (2007), did not hold that restriction applied to other procedural defaults such as *Stone*.[6]

Most recently, in determining whether a Court of Appeals erred in granting a certificate of appealability in a habeas proceeding on a non-constitutional issue in violation

---

[6] That Congress chose to not legislatively overrule the holdings that courts have discretion to find waiver after a state's failure to raise procedural default or to raise a *Teague* claim arguably signifies Congress's acceptance of those holdings. *Flood v Kuhn*, 407 U.S. 258, 281–282 (1972).

23

of 28 U.S.C. 2253(c), where that issued was only first raised at the Supreme Court, the Court held that "[b]ecause we conclude that § 2253(c)(3) is a nonjurisdictional rule, the Court of Appeals had jurisdiction to adjudicate Gonzalez's appeal." *Gonzalez v. Thaler*, No. 10-895, --- S. Ct. ----, 2012 WL 43513, at *9 (Jan. 10, 2012).

### C.   As with All Other Non-Jurisdictional Defenses or Procedural Bars to Habeas Petitions, Habeas Courts Have Discretion to Review Fourth Amendment Violations When the State Fails to Timely Raise a *Stone v. Powell* Bar to the Petition

The Supreme Court has yet to consider the consequences of a state's failure to timely raise the non-jurisdictional *Stone* bar. When the state fails to timely raise other non-jurisdictional defenses or bars to consideration of the merits of habeas petitions, courts have discretion to consider the petitions. Point I (B), *supra*. To rule otherwise with respect to the *Stone* bar would effectively render the *Stone*'s bar a jurisdictional one, despite the Court expressly stating that it is not.

First, the failure to raise a *Stone* bar is analogous to that of the failure of the State to raise procedural default, non-exhaustion, or non-retroactivity bar. Like the *Stone* rule, a procedural default is not jurisdictional, but rather is based on considerations of comity and the orderly administration of criminal justice. *Fay v. Noia*, 372 U.S. 391, 430-38 (1963). The reason for permitting such review when the state has not timely raised a default is that the equities that normally weigh against consideration of a procedurally defaulted claim, finality and federalism, do not have

24

equivalent force where a state has not asserted its interest in compliance with its own procedural rules in the petitioner's federal habeas corpus proceedings. *Esslinger v. Davis*, 44 F.3d 1515, 1528 (11th Cir. 1999) ("[W]hen, as here, the state waives a habeas petitioner's procedural default in failing to obtain appellate review of a claim, the district court should assume that the waiver is justified."); *Harmon v. Ryan*, 959 F.2d 1457, 1461 (9th Cir. 1992). Similarly, finality and federalism do not justify a rule requiring federal courts to refuse to hear Fourth Amendment claims where a state fails to assert its interest in the integrity of its own prior adjudication of them.

Concerns of federalism and respect for a state's criminal judgment are marginal where a State commits a procedural forfeiture. *Se*e Wright et al., 13 Federal Practice and Procedure, § 4405, 32–33 (1991 & Supp.) (both claim and issue preclusion may be waived by party entitled to demand preclusion). Further, State's attorneys should be in the best position to advance the state's interests in federalism and comity. A State that fails to argue that a habeas petitioner's Fourth Amendment claim was fully and fairly litigated in state court and thus is not subject to full merits' review in habeas corpus proceedings is not entitled to an exemption from the rule that defenses must be pleaded or be subject to waiver on comity or federalism grounds.

As one Circuit Court has noted, basic fairness requires holding State's

25

attorneys to the same standards imposed on habeas petitioners regarding non-jurisdictional matters:

> The Supreme Court has enforced strict procedural forfeitures on habeas petitioners in the interests of efficient and final adjudication. Why should not the state be similarly held to a pedestrian rule of appellate procedure? Concerns of federalism and respect for a state's criminal judgments are marginal here because the state brought the problem on itself.

*Boardman v. Estelle*, 957 F.2d 1523, 1537 (9th Cir. 1992).

Thus, in *Boardman*, the Court after recognizing that the *Teague* bar (like the *Stone* bar) "is grounded in concerns for comity and federalism" held that "courts of appeals are not required, to address a *Teague* defense raised for the first time on appeal." *Id*. at 1537.

Other courts have similarly recognized that waiver doctrines should be applied against the State as against habeas corpus petitioners. *Williams v. Dixon*, 961 F.2d 448, 458 (4th Cir. 1992) ("However, finality, and its companion, waiver, must run along a two-way street."); *Falconer v. Lane*, 905 F.2d 1129, 1135 (7th Cir. 1990) ("[W]aiver is not an obstacle reserved for habeas petitioners alone."). The equal application of waiver rules is needed both in order to both treat litigants fairly and to discourage sandbagging. As pointed out in *Granberry v. Greer*, 481 U.S. 129 (1987), a different rule would result in wasteful and unnecessary litigation by

26

permitting the State to seek a favorable ruling on the merits in the district court while holding the exhaustion defense in reserve for use on appeal if necessary. *Id*. at 132-133. Similarly, this Court has held in another context "[t]he waiver rule promotes judicial economy by 'prevent[ing] a litigant from "sandbagging" the district judge by failing to object and then appealing.' (internal citation omitted). Absent such a rule, we would be forced 'to consider claims that were never reviewed by the district court.' " *United States v. Male Juvenile*, 121 F.3d 34, 39 (2d Cir. 1997).

Three of the four Circuit Courts of Appeals to have considered this issue, have held, that, like other failures to raise procedural, non-jurisdictional, bars, where the State has failed to raise a *Stone v. Powell* claim at the lower court, an appellate court has discretion as to whether to apply the *Stone* equitable bar on appeal. *See Tart v. Massachusetts*, 949 F.2d 490, 504 (1st Cir. 1991) (reaching merits of Fourth Amendment claim in habeas proceeding because the Commonwealth had not asserted the *Stone* defense); *Davis v. Blackburn*, 803 F.2d 1371, 1372-73 (5th Cir. 1986) (per curiam) (divided panel held that in appropriate cases "a federal court is not foreclosed from *sua sponte* applying the principles of *Stone*" noting that *Stone* is a "prudential" not a "jurisdictional" rule); *United States v. Ishmael*, 343 F.3d 741, 742-43 (5th Cir. 2003) (holding that the court had discretion whether to apply the procedural bars of *Stone* and *Teague* when not raised by the government in the

district court); *Wallace v. Duckworth*, 778 F.2d 1215, 1220 n.1 (7th Cir. 1985) ("Moreover, respondents never raised any *Stone v. Powell* argument, and since the rule of *Stone v. Powell* is not a jurisdictional rule, we need not raise the issue *sua sponte*." (citation omitted)).

Only a divided panel of the Ninth Circuit Court of Appeals has held otherwise. *Woolery v. Arave*, 8 F.3d 1325 (1993). In *Woolery*, after quoting the language from *Stone* that the rule "does not mean that the federal court lacks jurisdiction over such a claim," the majority nevertheless held that it "reads *Stone* as a categorical limitation on the applicability of fourth amendment exclusionary rules in habeas corpus proceedings." *Id*. at 1326, 1328. Thus, that Court concluded that *Stone* precludes a federal court in a habeas proceeding from enforcing the Fourth Amendment exclusionary rule "even though the state has failed to raise the issue." *Id*. at 1326.

In the nearly 20 years since the *Woolery* decision, no other Circuit has embraced this holding. Respectfully, as forcefully argued in the dissenting opinion in that case, such a holding "creates for the benefit of states's attorneys an unwarranted and unprecedented exception from the rule that district courts are under no obligation to raise non-jurisdictional issues *sua sponte*" which inexplicably treats the state's failure to invoke the *Stone* doctrine differently from its failure to raise a

procedural default. *Id*. at 1329-30 (Reinhardt, J., dissenting).

In short, if a State does not timely assert an interest in the finality of its own proceedings, it loses the ability to demand, rather than request, that federal courts not consider a particular federal claim. That is as true with respect to Fourth Amendment claims as with all others. A federal court is not required to do the State's work and raise the *Stone* bar *sua sponte*. It may choose to do so, but the court also has the power to decide the claim on the merits.

**D.    This Court Should Review the Merits of Mr. Young's Claim That, as Found by the Court Below, the Admission of the Identification Evidence in this Case Was Contrary to or Involved an Unreasonable Application of Clearly Established Federal Law**

The State has not set forth a single reason why this Court should overlook the State's failure to timely assert that *Stone* was an obstacle to review of Petitioner's challenge to Ms. Sykes' in-court identification. Indeed, the State's brief never even acknowledges that it has never previously suggested in any shape, fashion or form that *Stone* barred merits review, but instead only argued this issue on the merits. At best, this misleading silence suggests that the State cannot make compelling arguments as to why its failure to raise this issue should be ignored.

Never, during the four years Mr. Young's petition was pending in the district court did the State raise the *Stone* bar. Rather, despite the fact that the Rules

29

Governing Section 2254 Cases in the United States District Courts (HCR) expressly require the Respondent's answer to state whether any claims in the petition are barred, HCR Rule 5(b), the State only argued in its answer, and in all of its pleadings, the merits of the claim (A41-47; Mem. Law Supp. Answer). Nor, once the lower court issued its order granting the writ, did the State file a motion with the District Court to alter its judgment, pursuant to Federal Rules of Civil Procedure Rules 59(e) or 60(b). Thus, despite four years and numerous opportunities to raise *Stone*, the State failed to do so.

Not only is the State of New York charged with knowledge of the holding in *Stone*, but the Assistant Monroe County District Attorney who filed the Answer and Supporting Memorandum in this case, Ms. Courtney, is very experienced in defending habeas petitions, having repeatedly and successfully raised a *Stone* defense in twenty reported decisions. *See, e.g.*, *Cook v. Donnelly*, No. 02-CV-6073(VEB), 2009 WL 909637, at *4 (W.D.N.Y. March 31, 2009) ( "As respondent points out, to the extent that Cook asserts a Fourth Amendment claim, it is precluded from habeas review under the doctrine of *Stone v. Powell* . . . ."); *Crenshaw v. Miller*, No. 02-CV-6623, 2004 WL 1040852 (W.D.N.Y. March 26, 2004) ("[R]espondent contends that habeas relief is unavailable to Crenshaw who had a full and fair opportunity to litigate his Fourth Amendment concerns in his state court

30

proceedings."). "[T]he lawyers employed by a state . . . should be masters" of federal habeas corpus law and defenses." *Fagan v. Washington*, 942 F.2d 1155, 1157 (7th Cir. 1991). Thus, there is no basis to believe the decision of the State (and of Ms. Courtney) to not raise the *Stone* defense here was an oversight, as opposed to the very strategy condemned by the Court in *Granberry v. Greer*, 481 U.S. 129 (1987), of first seeking a win on the merits to establish a legal point while holding the defense in reserve for use on appeal if necessary. *Id*. at 132-33. In either event, whether inadvertent or intentional, there is no reason to excuse the State's failure to raise the appropriate legal arguments at the appropriate time.

The rule in *Stone*, like the rules regarding exhaustion and *Teague* non-retroactivity, is premised on concerns of federalism and comity. But the State, having not timely sought to protect its interests and having still not set forth any justification as to why its failure should be excused, is not equitably in a position to complain about comity and federalism. As this Court held in *Agard v. Portuondo*, 159 F.3d 98, 100 (2d Cir. 1998), *rev'd on other grounds*, 529 U.S. 61 (2000), "comity also calls for representatives of states not to agree to federal courts expending substantial time in addressing the merits of a case, only to argue belatedly that the merits should not have been reached."

There are other reasons the Court should not overlook the State's tardiness.

31

*Stone* is intended to bar re-litigation of Fourth Amendment claims. Unlike most cases where *Stone* bars claims, this Petition does not require re-litigation of the issue of the unlawful arrest. The state courts found, and the State does not dispute, that there was a Fourth Amendment violation in this case. Consequently, if this Court refuses to excuse the State's failure to raise the *Stone* bar, this Court would not be second-guessing the state courts on the merits of the primary constitutional claim. All courts have agreed that Petitioner was arrested without probable cause. And because there is no disagreement about whether there was a constitutional violation, the comity and federalism interests at stake, which are already low due to the State's failure to raise the issue previously, are even further reduced. The only issue in this case is whether there was a sufficient showing of an independent basis to permit the admission of the in-court identification evidence. And this is only derivatively a Fourth Amendment question or issue; the same issue could arise regardless of the constitutional source of contamination, e.g. the denial of the Sixth Amendment right to counsel. *See, e.g.*, *United States v. Wade*, 388 U.S. 218 (1967). And more fundamentally, this issue is directly related to the reliability and fundamental fairness of the trial[7].

_____

[7] Additionally, the Supreme Court has intimated that the independent source inquiry, which is intended to assess the reliability of the eye-witness identification is required as a matter of due process. *United States v. Crews*, 445 U.S. 463, 473 n.19 (1980). This is another reason that this Court should reach the merits of Petitioner's claim.

Additionally, the *Stone* bar was based in large part on the concern that the exclusionary rule, in the Fourth Amendment context, prevents the fact-finder from considering presumptively reliable and highly incriminating and relevant physical evidence, thus making it easier for the guilty to avoid convictions. *Stone*, 428 U.S. at 465, 490. As the Court wrote, generally, denials of claims of violations of Fourth Amendment rights do not impugn the integrity of the fact-finding process. *Id*. at 479.

Petitioner, however, is not contesting the admission of presumptively reliable physical evidence. Far from it; at issue in Petitioner's case is the admission of a form of evidence, eyewitness identification testimony, that has been repeatedly recognized as being often unreliable and the major contributor to wrongful convictions. *See infra* note 10 and accompanying text. Further, as detailed by the Court below (A80-83) and in Point II (C), *infra*, the identification evidence *in this case* lacks the typical indicia of reliability that might weigh against re-litigating a Fourth Amendment claim on collateral review. As the Court below found upon its review of the record "there was a 'very substantial likelihood of irreparable misidentification.'" (A82). Without the unreliable identification evidence in this case, there is practically no evidence to support a conviction or a belief that Mr. Young committed the charged crimes. *See* Point II(D), *infra*. In fact, without it, the State's case could not have withstood a motion for a directed verdict or a trial order

of dismissal.

It follows, therefore, that the balancing process employed by the Court in *Stone*, in which the utility of the exclusionary rule was weighed against the costs of extending it to collateral review, does not justify excusing the State's failure to timely raise the *Stone* bar in this proceeding.  Rather, for the reasons set forth above, this Court should proceed to the merits of this appeal.

**POINT II:  THE TRIAL COURT'S DETERMINATION THAT MRS. SYKES HAD A BASIS FOR HER IDENTIFICATION OF PETITIONER INDEPENDENT FROM HIS ILLEGAL ARREST WAS BOTH AN UNREASONABLE APPLICATION OF CLEARLY ESTABLISHED FEDERAL LAW AND AN UNREASONABLE DETERMINATION OF THE FACTS IN LIGHT OF THE EVIDENCE PRESENTED**

**A.     Introduction**

In November 1998, Petitioner's New York conviction for the March 29, 1991 burglary and robbery of Mr. and Mrs. Sykes was reversed and the lineup identification by Mrs. Sykes ordered suppressed on the ground that Petitioner had been arrested without probable cause and the lineup was the fruit of that arrest. The state appellate court sent the case back to the trial court to determine whether Mrs. Sykes had the ability to make an in-court identification at a retrial that was independent of the unlawful arrest and tainted identification procedure (A91).

As detailed in the Statement of Facts (pp. 8-10) and by the court below (A74), the independent basis hearing testimony of Mrs. Sykes was that on March 29, 1991, an intruder entered the home of Mr. and Mrs. Sykes and robbed them. The intruder was wearing a scarf which covered his face, except for his forehead, eyes, and part of his nose. Afterwards Mrs. Sykes was unable to help the police prepare a composite sketch because none of these features were unusual and she had not seen any other features. She described the intruder as a black male, five foot ten inches

35

tall, in his twenties. On April 25, 1991 she was shown a photo array comprised of six color photographs, including one of Petitioner. She did not identify Petitioner as the perpetrator and, on at least one occasion, she acknowledged that she selected another member of the array as the guilty party. Two days later Petitioner, then thirty three years, eight months old and six feet tall, was arrested and included in a lineup, viewed by Mr. and Mrs. Sykes, during which the participants each repeated lines uttered by the intruder. Mrs. Sykes (but not Mr. Sykes) identified Petitioner as the intruder. Mrs. Sykes testified at Petitioner's August 1993 trial that she identified him at the lineup solely because of his eyes and voice.

Despite (1) Mrs. Sykes' limited opportunity to view the intruder's face and her resultant inability to assist in the preparation of a composite drawing; (2) the discrepancies between her description and the Petitioner's age and height; (3) Mrs. Sykes' inability to select Petitioner's photograph from the array she viewed prior to the illegal arrest; (4) the fact that Petitioner was the only person in the photo array who was also in the lineup; (5) Mrs. Sykes' admission that her ability to identify Petitioner was based solely on his (admittedly not unusual) eyes and the voice she heard at the illegal lineup; and (6) the more than one year between the incident and the first trial where her testimony was explicitly based on the lineup and the eight years between the incident and independent basis hearing, the New York trial and

36

appellate courts found that the State had established that Mrs. Sykes had a basis for giving identification testimony at Petitioner's January 2000 retrial independent of the illegal arrest and lineup.

As detailed below, the Magistrate Judge correctly held that the state court decisions finding that Ms. Sykes in-court identification of Petitioner was independent of the unconstitutional lineup were contrary to and an unreasonable application of Supreme Court precedent, and also were based on unreasonable factual determinations in light of the evidence presented in the state courts. *Williams v. Taylor*, 529 U.S. 362, 375-76 (2000). Indeed, the State's Brief makes no argument to the contrary, with the State choosing instead to put all its eggs in the *Stone* bar basket.

> **B.** **The Standard for Reviewing the State Courts' Determination That the In-Court Identification Testimony of Ms. Sykes Was Independent of the Illegal Lineup Identification**

Whether an in-court identification has a source independent of an earlier "tainted" or illegal identification is a mixed question of law and fact. *See Wade*, 388 U.S. 218, 241-42 (1967); *Tomlin v. Myers*, 30 F.3d 1235, 1241 n.12 (9th Cir. 1994); *see also Sumner v. Mata*, 455 U.S. 591, 597 (1982) (per curiam) (holding that whether a pretrial identification was suggestive is a mixed question of law and fact). "On federal habeas review, mixed questions of law and fact translate to 'mixed

constitutional questions (i.e., application of constitutional law to fact)[.]' " *Overton v. Newton*, 295 F.3d 270, 277 (2d Cir. 2002) (quoting *Williams v. Taylor*, 529 U.S. at 400 (2000) (O'Connor, J., concurring)); *United States v. Vasquez*, 389 F.3d 65, 74-75 (2d Cir. 1994). Thus, the state courts' determination on the ultimate issue is not entitled to the § 2254(d) presumption of correctness; rather as a question of law, the issue merits independent consideration in a federal habeas corpus proceeding. *See*, e.g., *Endress v. Dugger*, 880 F.2d 1244, 1249 (11th Cir. 1989) (citing *Miller v. Fenton*, 474 U.S. 104, 106 (1985) (holding that the issue of the voluntariness of a confession is not an issue of fact entitled to the former § 2254(d) (now § 2254(e)(1)) presumption, but is a legal question meriting independent review)). Under AEDPA, such questions "are subject to the standard set forth in 28 U.S.C. § 2254(d)(1), which requires the habeas court to determine whether the state court's decision 'was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.' " *Overton*, 295 F.3d at 277 (quoting 28 U.S.C. § 2254(d)(1)).

Under the "contrary to" clause, a federal habeas court may grant the writ "if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than [the Supreme Court has] done on a set of materially indistinguishable facts." *Bell v. Cone*, 535 U.S. 685, 694 (2002). Under

the "unreasonable application" clause, a federal habeas court may grant the writ "if the state court correctly identifies the governing legal principle from [the Court's] decisions but unreasonably applies it to the facts of the particular case." *Id*. at 694.

**C.    The State Court's Determination that Mrs. Sykes Possessed an Independent Basis for Her In-Court Identification of Petitioner Was Contrary to Clearly Established Federal Law**

A defendant in a criminal case may challenge a witness's in-court identification as the unconstitutional fruit of an illegal prior arrest. *United States v. Crews*, 445 U.S. 463, 472–74 (1980). In *Crews*, the Supreme Court set forth the test for determining when, as in this case, a witness may be permitted to present in-court identification testimony after an illegal arrest and a suppressed out of court lineup.

First, the Court stated that its decision in *Wong Sun v. United States*, 371 U.S. 471 (1963), "articulated the guiding principle for determining whether evidence derivatively obtained from a violation of the Fourth Amendment is admissible against the accused at trial: 'The exclusionary prohibition extends as well to the indirect as the direct products of such invasions' " (internal citations omitted). *Crews*, 445 U.S. 463 at 470). Thus, the Court held that

> the question before the court is whether the chain of causation proceeding from the unlawful conduct has become so attenuated or has been interrupted by some intervening circumstance so as to remove the "taint" imposed upon that evidence by the original illegality. Thus most cases begin with the premise that the

39

> challenged evidence is in some sense the product of illegal
> governmental activity.

*Crews,* 445 U.S. at 471; *see also Wong Sun*, 371 U.S. at 488.

In order to determine the answer to this question, courts must focus on whether "the victim possesses knowledge of and the ability to reconstruct the prior criminal occurrence and to identify the defendant from her observations of him at the time of the crime." *Crews,* 445 U.S. at 471. The Court in *Crews* cited with approval and applied the factors set forth in *Wade*, for determining if there are "independent origins" for the evidence. *Crews*, 445 U.S. at 473 n.18.

In *Wade*, the Court held that an in-court identification following an illegal lineup procedure (conducted in violation of the right to counsel) is not admissible unless the prosecution carries its burden of demonstrating by clear and convincing evidence that "the in-court identification was based upon observations of the suspect other than the [tainted] lineup identification." *Wade*, 388 U.S. at 240. The factors set forth in *Wade* for determining independent basis for identification evidence after an illegal lineup, and applied by the Court in *Crews*, are (1) the prior opportunity to observe the alleged criminal act; (2) the existence of any discrepancy between any pre-lineup description and the defendant's actual description; (3) any identification prior to the lineup of another person; (4) a photographic identification of the defendant prior to the illegal lineup; (5) the failure to identify the defendant on a

prior occasion; and (6) the lapse of time between the alleged act and the lineup identification. *Id.* at 241. The *Wade* court held that it "is also relevant" to consider facts concerning the conduct of the tainted lineup itself. *Id.* at 241.[8]

The question in the present case, therefore, is whether, the state courts' holdings that Mrs. Sykes, the testifying witness, had a source or basis for her identification of Petitioner independent of the unlawful post-arrest identification during the tainted six-person lineup was contrary to the holdings of the Court in *Crews*, *Wade*, and *Wong Sun*. In light of Petitioner's unlawful arrest on April 27, 1991, and the tainted six-person lineup procedure later that same day, the prosecution had the burden to establish by clear and convincing evidence that there existed an independent basis for Mrs. Sykes' in-court identification. *Id.* at 240.

As detailed below, applying the *Crews* and *Wade* factors, the state courts' determination was objectively unreasonable under § 2254(d)(1) and (d)(2) and therefore requires this Court to grant Petitioner's writ of habeas corpus.

### The Prior Opportunity to Observe the Alleged Criminal Act

First, the facts surrounding Mrs. Sykes' opportunity to observe the criminal act, which occurred at her home on March 29, 1991, overwhelmingly militate against

---

[8]  This is a different set of factors than that the Court held should be considered when the out of court procedure was suggestive but not illegal. *See Neil v. Biggers*, 409 U.S. 188, 199-200 (1972).

the finding of the state courts that she possessed an independent basis to identify

Petitioner during his retrial in January 2000. As the court below summarized,

> the viewing was made under extremely stressful circumstances, including the intruder, wielding an axe over the head of her wheelchair-bound husband, threatening, "I will kill him," if the Sykes did not cooperate. Although Mrs. Sykes had several minutes to observe the intruder, he was wearing a scarf that almost completely covered his face and head, and thus she could see only his forehead, eyebrows, eyes and that part of his nose above the scarf.

(A81-82.)

 The entire incident lasted only "five to seven minutes" (A120); the intruder,

a stranger, wore a scarf over his face, which covered his lips, nose, ears, and cheeks,

leaving only his eyes uncovered (A136-39) and a blanket covering his clothes the

entire time (A131); and Mrs. Sykes could not recall a single detail regarding the

intruder's mouth, ears, forehead, facial hair, or hairstyle (A136-38), or of a single

"noticeable or distinct physical characteristic" of the few parts of his body that were

not covered by either the scarf or the blanket (A138-41). Moreover, Mrs. Sykes

could not even recall whether the intruder wore a hat, or a watch, or jewelry, or had

facial hair, the type, length, or color pants the intruder wore, or whether the blanket

covered up the intruder's legs at all (A132, 134-35, 141; Trial II 74-81).  Further,

Mrs. Sykes admitted that she had screamed when she saw the intruder with weapons

and had been "scared" and "petrified" (A142). Furthermore, Mrs. Sykes acknowledged being distracted by her dog during the incident, even holding it "by the collar" because she was afraid what would happen if the dog upset the intruder (A118-20).[9]

This Court and others have explicitly recognized that "it is human nature" for individuals to focus their attention more on a perpetrator's deadly weapon "than on the face of the person" holding that weapon. *Raheem v. Kelly*, 257 F.3d 122, 138 (2d Cir. 2001) (reversing district court's denial of federal habeas petition based on unduly suggestive pretrial lineup identification); *Kennaugh v. Miller*, 150 F. Supp. 2d 421, 435 (E.D.N.Y. 2001) (refusing to find independent source for eyewitness's in-court identification of petitioner where intruder had threatened eyewitness with a firearm, in part because "experts have confirmed the rather obvious fact that if someone is brandishing a gun at you, your mind is likely to be focused on the gun and not on the facial features of the people involved" (internal quotations omitted)); *see also Thigpen v. Cory*, 804 F.2d 893, 897 (6th Cir. 1986) (granting petition for

---

[9] Numerous studies have recognized the impact of stress on the accuracy of identifications. *See* Kenneth A. Deffenbacher et al., *A Meta-Analytic Review of the Effects of High Stress on Eyewitness Memory*, 28 Law & Hum. Behav. 687 (2004); Charles A. Morgan III et al., *Accuracy of Eyewitness Memory for Persons Encountered During Exposure to Highly Intense Stress*, 27 Int'l J.L. & Psychiatry 265 (2004).

federal habeas relief based on unduly suggestive pretrial lineup identification in part because district court failed to consider "the degree of stress that the witness might have felt and how it might have affected his attention." where witness admitted to being "scared during the robbery . . . .").

It is because of Mrs. Sykes' limited opportunity to view the intruder's features and her failure to see anything unusual about those few features that she did observe (A140) that she was unable to assist the attending police officers in preparing a composite sketch of the intruder (A131).

The state courts relied upon Mrs. Sykes' insistence that her failure to recall any details whatsoever regarding the intruder is because she was "looking at his eyes" during the entire five-to-seven-minute encounter (A140). Mrs. Sykes acknowledged, however, that there was "[n]othing unusual that stood out" about the intruder's eyes (A140). Indeed, she testified at the preliminary hearing in 1991, at the first trial in 1993, and at the independent source hearing in 1999, that she could not identify any identifying characteristics of the intruder's eyes.

Mrs. Sykes' description thus suffers from the same defects as those in *Raheem v. Kelly*, 257 F.3d 122 (2d Cir. 2001), where during a *Wade* hearing as to whether an eyewitness possessed a basis for his testimony independent of a previously tainted lineup procedure, the eyewitness relied on his observation of the perpetrator's eyes,

44

but could only describe them as "weird." *Raheem*, 257 F.3d at 138–39. In granting habeas corpus relief, this Court found this testimony insufficient to carry the prosecution's heavy burden, noting that the witness's testimony lacked any details whatsoever of the physical features, characteristics, or peculiarities *about* those eyes, such as their "color, shape, or protrusion." *Id.* (comparing witness's testimony that the shooter's eyes "were different" to witness testimony given in *Dunnigan v. Keane*, 137 F.3d 117, 121 (2d Cir. 1998), where the witness specifically identified the defendant's "bugged eyes"). Indeed, the eyewitness in *Raheem* only testified that "something about [the eyes] stood out"—testimony insufficient to establish an independent source for the eyewitness's in-court identification under *Wade. Id.* Here, Mrs. Sykes explicitly admitted at the independent source hearing on March 11, 1999 that "[*n*]*othing* unusual [] stood out" about the intruder's eyes (A140) (emphasis added) .

As in *Raheem*, Mrs. Sykes' failure to notice anything distinct as to the perpetrator's eyes demonstrated that her opportunity to meaningfully observe was lacking. As the Court below found, given the limited observation of the intruder whose face and body was covered, "this factor clearly weighs against the prosecution." (A82.) Furthermore, after the lineup, Mrs. Sykes had additional in-court exposure to Mr. Young's face. The extraordinary ability that Mrs. Sykes

45

claimed at the independent source hearing—the ability to disentangle her memories of the robbery from all of her subsequent exposure to Mr. Young—is simply beyond the capability of human memory. *See* Kenneth A. Deffenbacher et al., *Mugshot Exposure Effects: Retroactive Interference*, *Mugshot Commitment, Source Confusion, and Unconscious Transference*, 30 Law & Hum. Behav. 287, 299 (2006); Elizabeth Loftus & Hunter G. Hoffman, *Misinformation and Memory: The Creation of New Memories*, J. Experimental Psychol., 118 J. Experimental Psychol. 100 (describing the phenomenon of unconscious transference, also known as source confusion).

### The Existence of Any Discrepancy Between Any Pre-Lineup Description and the Defendant's Actual Description

As to the second relevant factor under *Wade*, appreciable discrepancies exist between Mrs. Sykes' very general pre-lineup description of the intruder and Petitioner's actual appearance. The entirety of the description that Mrs. Sykes provided to law enforcement the evening of March 29, 1991 is as follows: "A black man in his twenties, five-ten, medium build." (A131.) Petitioner is six feet tall and was nearly thirty-four years old at the time of the incident at the Sykes' home (Suppression Hr'g 156).

The State argued below that Ms. Sykes' description of the robber was

46

"extremely close" to Mr. Young's description (Mem. Law Supp. Answer 21), but it was not. The State urged that "[s]he described his height within two inches of his actual height, and his age within a few years." *Id.* In fact, Mrs. Sykes testified that the intruder was five feet, ten inches tall (A167). The two-inch difference between 5'10" and Petitioner's actual height of six feet is particularly salient because that two-inch difference is not merely an error in estimation, but is the difference between a man of average height and a tall man. *See* Cynthia L. Ogden, et al., Centers for Disease Control, *Mean Body Weight, Height, and Body Mass Index, United States, 1960-2002* (2004) at 15, *available at* http://wwvv.cde.gov/nchs/data/ad/ad347.pdf. The purported gap of "a few years" in age is, in reality, the difference between "a black man in his twenties" (A131) and Mr. Young's actual age, nearly 34 years old in 1991. These general characteristics were the sum total of the description that Ms. Sykes was able to give. Thus, the only information that Mrs. Sykes provided that correctly matches Petitioner is his race and gender. In contrast to these discrepancies here as to both age and height, the Court in *Crews* found it significant that the accused in that case "closely matched the description given by the victim immediately after the robbery." *Crews*, 445 U.S. at 473 n.18.

Further, due to her limited observation of the intruder's features, Mrs. Sykes did not identify the intruder's clothing, or distinguishing characteristics. Mrs. Sykes'

47

description consisting of "general information as to the shooter's age, height, and weight" without "cit[ing] any other physical details" does not support the state courts' determination that she possessed an independent source for her in-court identification. *See Raheem v. Kelly*, 257 F.3d 122, 138–39 (2d Cir. 2001) (reversing denial of federal habeas relief where descriptions offered by pair of witnesses prior to unduly suggestive in-person lineup contained only "general information" with no "physical details" beyond the shape of the intruder's face).

### Any Identification Prior to the Lineup of Another Person; a Photographic Identification of the Defendant Prior to the Illegal Lineup; the Failure to Identify the Defendant on a Prior Occasion

The third, fourth, and fifth factors to be considered under *Wade* and *Crews* all focus on who, if anyone, the witness selected at an identification proceeding conducted prior to the illegal lineup. The third factor is whether, at such a procedure, the witness identified a different person as the perpetrator. The fourth factor is whether the eyewitness identified the defendant by picture, prior to the lineup. The fifth factor is whether the witness failed to identify the defendant when the witness had the opportunity to do so. *Wade*, 388 U.S. at 240; *Crews*, 475 U.S. at 473 n.18.

On April 25, 1991—twenty-seven days after the incident—Investigator Schroeder of the Brighton Police Department showed a photographic array to Mrs.

48

Sykes. The array contained six full-color photographs, one of which was of the Petitioner's entire face. Mrs. Sykes studied the eyes of each the photographs. Not only is it undisputed that she did not select the Petitioner's photograph, but Mrs. Sykes also offered conflicting testimony as to whether she had identified an entirely different individual's photograph when viewing the array (A149, 152, 154-56). Accordingly, the third, fourth, and fifth factors under the *Wade* analysis strongly undermine the validity of the state courts' determination.

Specifically, at the preliminary hearing conducted on April 30, 1991, five days after the photo array, when asked if she had been able to select a picture from that array, Mrs. Sykes testified that "I selected one, yes" and "I selected a picture, but [] didn't know if it was right or not." (A155-156; Prelim. Hr'g 7, 16, 26.) However, at the independent source hearing conducted nearly eight years later on March 11, 1990, Mrs. Sykes only recalled: "I looked at all of [the photographs] and was not comfortable picking anyone out." (A155.) Then, at Petitioner's retrial in January 2000, Mrs. Sykes on direct examination testified that she could not make an identification at the array, but then admitted that she had testified at the preliminary hearing that she had selected someone other than Petitioner (Trial II, 68-69, 86-87).

Thus, regardless of how Mrs. Sykes chooses to characterize her inability to identify Petitioner during the procedure, it is undisputed that whichever

photograph(s) she may or may not have selected from the array, she did not select Petitioner's photograph. These facts are in stark contrast to those in *Crews*, in which the "the victim failed to identify anyone other than respondent, . . . but twice selected respondent without hesitation in nonsuggestive pretrial identification procedures." *Crews*, 475 U.S. at 473 n.18. Accordingly, Mrs. Sykes inability to identify the defendant's photograph and her apparent identification of someone else, strongly weigh against the state courts' finding that the State established that Mrs. Sykes possessed an ability to make an in-court identification at Petitioner's retrial, independent of the illegal lineup where she heard Petitioner speak.

### The Lapse of Time and the Conduct of the Lineup

The final two factors relevant for an independent source determination pursuant to *Wade*—the lapse of time between the criminal act and the tainted lineup procedure, and any additional facts concerning the conduct of the tainted lineup procedure, 388 U.S. at 241, also strongly weigh against the state courts' determination that the prosecution met its burden of establishing an independent basis for Mrs. Sykes' in-court identification testimony.

In this case, there are three critical periods of time to consider in determining if, at the independent source hearing, the prosecutor proved that there was an independent basis for Mrs. Sykes' testimony.

50

First, there was a month and six days between the incident and the lineup in which the state court found Petitioner was illegally compelled to participate (A91). There is no evidence in the record that during this period Mrs. Sykes recalled additional characteristics of the intruder or details of the incident, or that she approached law enforcement with any further information regarding the intruder's appearance to add to her one-sentence description from the night of the incident. The participants at that lineup were required to speak and Mrs. Sykes admitted that she relied upon hearing the Petitioner's voice as the basis for her identification (A161). Consequently, as the court below held, "it does not make sense . . . to measure the duration with the lineup as the second point in time." (A82.)

The second time period, is the year between the incident and the first trial at which Mrs. Sykes testified that her identification of the Petitioner as "that person that [she] identified at the lineup" (Trial I, 57) was based on a "combination" of factors "from seeing him and also the voice." (A73.) As the court below noted "there is no indication in the record that Mrs. Sykes had the opportunity to have [Petitioner] speak at trial before she made her in-court identification of him." (A82.) Thus, that identification, too, was expressly based on the voice heard at the improperly conducted and suppressed lineup. This one year period is far longer than the delay of seven months that the Supreme Court held in *Neil v. Biggers*, 409 U.S. 188, 201

(1972), was a "seriously negative factor" weighing against independent reliability.

The third period is the period from the incident to the independent source hearing, -- nearly eight years. This Court, in similar circumstances, has considered the duration between the incident and the retrial. *See Raheem v. Kelly*, 257 F.3d 122, 139 (2d Cir. 2001). At that hearing, Mrs. Sykes again stated that her ability to identify Petitioner was based on his eyes and voice (A168).

Thus, the court below was correct in concluding that

> Reviewing the *Wade* factors, all of them are on Petitioner's side of the scale, and none of them are on the government's. The circumstances of the original viewing during the crime and the subsequent identification procedures overwhelmingly suggest that Mrs. Sykes' alleged independent "recollection" of Petitioner's face was irrevocably tainted by her having viewed defendant in the lineup and having heard him speak, with no independent basis whatsoever. It is evident that under totality of the circumstances, there was a "very substantial likelihood of irreparable misidentification." *Manson v. Brathwaite*, 432 U.S. 98, 116 (1977).

(A82.)

As the Court recognized in *Wade* " '(i)t is a matter of common experience that, once a witness has picked out the accused at the line-up, he is not likely to go back on his word later . . .' " *Wade*, 388 U.S. at 229 (internal citation omitted). Indeed, this is precisely why the Court established that it is the heavy burden of the prosecution—not a criminal defendant—to establish by clear and convincing

52

evidence that there exists a basis for the identification independent from the tainted pretrial identification. Yet in this case, the state courts' independent basis determination rested on Mrs. Sykes' subjective belief that she excised the illegal lineup from her mind, as well as all of her in-court exposure to Mr. Young, all of the publicity surrounding the case, and her knowledge that Mr. Young would almost certainly be acquitted if she could not identify him. Mrs. Sykes' testimony that her identification of Mr. Young was untainted is inconsistent with the *Wade* factors, common sense, and the consensus of scientific evidence regarding how memory works. An individual's subjective, expurgatory statements are entirely uncorrelated to the likelihood that her memory is accurate. *See* Kenneth A. Deffenbacher, *Eyewitness Accuracy and Confidence: Can We Infer Anything about Their Relationship?* 4 Law & Hum. Behav. 243-60 (1980). Where a witness has been primed with information supporting an erroneous identification (such as repeated exposure to Mr. Young's face in photographs, the illegal lineup, and the 1993 trial), eyewitnesses are more confident when they are wrong than when they are correct. Elizabeth Loftus, *Semantic Integration of Verbal Information into a Visual Memory,* 4 J. Experimental Psych.: Hum. Learning And Memory 19-31 (1978).

The Supreme Court has long recognized "the dangers inherent in eyewitness identification and the suggestibility inherent in the context of the pretrial

identification," *Wade*, 388 U.S. at 235.[10] This Court, too, has "always given close

scrutiny the possibility of constitutional violations in criminal cases resting largely

or solely on eye-witness testimony." *Solomon v. Smith*, 645 F.2d 1179 (2d Cir.

1981) (finding that an in-court identification of petitioner had no basis independent

of impermissibly tainted pretrial lineup procedure).

By failing to properly hold the prosecution to its substantial burden or to offer

any record consideration of how the evidence satisfied the rigorous multi-factor

inquiry under *Wade*, it was an objectively unreasonable application of clearly

established Supreme Court precedent for the state courts to hold, based on the

conclusory statements of Mrs. Sykes, that she could make an in-court identification

---

[10] In fact, mistaken eyewitness identification evidence has proven to be the leading cause of wrongful convictions. *See, e.g.*, Laurie Gould et al., *Reforming the Use of Eyewitness Testimony*, 35 Okla. City U. L. Rev. 131, 134 (2010) (collecting empirical data from numerous studies and concluding that "approximately 4500 people are wrongfully convicted every year in the U.S. due to eyewitness identification."); Sandra Guerra Thompson, *Judicial Blindness to Eyewitness Misidentification,* 93 Marq. L. Rev. 639 (2009); Gary L. Wells & Deah S. Quinlivan, *Suggestive Eyewitness Identification Procedures and the Supreme Court's Reliability Test in Light of Eyewitness Science: 30 Years Later*, 33 Law & Hum. Behav. 1 (2009) ("[S]cientific studies of eyewitness have progressed and DNA exonerations show that mistaken identification is the primary cause of convictions of the innocent."); *see also State v. Delgado*, 902 A.2d 888, 895 (N.J. 2006) ("Misidentification is widely recognized as the single greatest cause of wrongful convictions in this country.") For a comprehensive summary of the factors which research has demonstrated impact the accuracy of identification evidence and the need for court decisions on admissibility of such evidence to be consistent with this research, in order to avoid wrongful convictions, see *State v. Henderson*, 208 N.J. 208, 27 A.3d 872 (N.J. 2011).

independent from the lineup. In this case in which Mrs. Sykes only observed a small portion of the intruder's covered face, could not help with a composite sketch, could not identify Petitioner at a photo array, and stated that her ability to identify the Petitioner at this retrial eight years after the incident was based on his eyes, which she testified were not usual, and his voice, which she heard at the illegal lineup, fair-minded jurists applying the *Crews* and *Wade* tests could not disagree that the state court's holdings are inconsistent with a prior decisions of the Supreme Court. *Harrington v. Richter*, 131 S. Ct. 770, 778 (2011).

**D.    Mr. Young Was Prejudiced by the Improper Admission of Mrs. Sykes' Identification Testimony**

Since the state courts did not address the harmless error issue, there is no state court holding regarding harmlessness to which AEDPA deference applies. *Smiley v. Thurmer*, 542 F.3d 574, 583-84 (7th Cir. 2008). Under these circumstances, a federal court, in habeas review, must apply the "*Brecht* standard of actual prejudice." *Fry v. Pliler*, 551 U.S. 112, 122 (2007), pursuant to which a court must determine whether the error in admitting the identification testimony had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993); *see also Fry v. Pliler*, 551 U.S. 112 (2007).

This Court explained in *Raheem* that "[t]he principal factors to be considered in the determination of whether the erroneous admission of evidence was harmless

are "the importance of the witness's wrongly admitted testimony, and the overall strength of the prosecution's case." (quoting *Wray v. Johnson*, 202 F.3d 515, 526 (2d Cir. 2000)). In assessing importance, this Court explained that it "consider[s] questions such as 'whether the testimony bore on an issue that is plainly critical to the jury's decision, . . . whether that testimony was material to the establishment of the critical fact or whether it was instead corroborated and cumulative, . . . and whether the wrongly admitted evidence was emphasized in arguments to the jury.' " *Raheem*, 257 F.3d at 142 (internal citation omitted).

As the court below found, without Mrs. Sykes' identification of Petitioner, the prosecution "had no case." (A83.) Mrs. Sykes' shaky testimony was essential to establishing the identity of the intruder. There was no other identification testimony, since Mr. Sykes was unable to identify the intruder. There was no fingerprint or DNA evidence linking Petitioner to the crimes, and no evidence linking Petitioner to the crimes was found in a search of his home. Petitioner made no inculpatory statements to the police. The only evidence, other than Mrs. Sykes' testimony, linking Petitioner to the home invasion was the testimony of an acquaintance of Petitioner that she obtained from him some of the property stolen from the Sykes home. However, as the court below wrote

> [e]ven assuming that this testimony was accurate, the
> source of Petitioner's possession of those items was

56

> unknown, and those items could have been acquired by petitioner in circumstances other than the robbery. This evidence is clearly inadequate upon which to base a conviction for robbery. Another acquaintance was found to have a pair of Mrs. Sykes' workout gloves in her garbage, but she testified that she did not ever see Young with the gloves, and she had many individuals coming through her home (which was a crack house) on a nightly basis.

(A83.)

The court below, therefore, correctly found "that as a matter of law, there is insufficient evidence of guilt, absent the identification evidence." (A83.) For these reasons, Mrs. Sykes' testimony formed the cornerstone of the prosecutor's summation (Trial II, 445-53, 458-59). Consequently, in evaluating the impact of the improperly admitted in-court identification testimony, the court below correctly concluded that the erroneous admission of the statements had a substantial and injurious effect on the jury's verdicts (A83). *See Raheem*, 257 F.3d at 143 (2d Cir. 2001) (granting § 2254 petition, noting that the prosecution emphasized the erroneously admitted identification testimony during summation and the absence of other evidence establishing the identity of the perpetrator).

## CONCLUSION

For all the reasons stated above this Court should affirm that portion of the judgment of the District Court granting the petition for a writ of habeas corpus.

Dated:      Rochester, New York
            January 20, 2012

Respectfully submitted,

Brian Shiffrin
Easton Thompson Kasperek Shiffrin LLP
16 West Main Street Suite 243
Rochester, New York 14614
585-423-8290
bshiffrin@etksdefense.com


John H. Blume, Esq.
Cornell Law School
112 Myron Taylor Hall
Ithaca, NY 14853-4901
(607) 255-1030
john-blume@lawschool.cornell.edu

58

**Federal Rules of Appellate Procedure Form 6.**

**Certificate of Compliance With Rule 28.1(e)**

Certificate of Compliance With Type-Volume Limitation,
Typeface Requirements and Type Style Requirements
This brief complies with the type-volume limitation of Fed.R. App. P.32(a)(7)(B)(i)

1.

    because:

        **this brief contains 13,471 words, excluding the parts of the brief exempted by Fed R. App. P. 32(a)(7)(B)(iii)**,

    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the

2.

    type style requirements of Fed. R. App. P. 32(a)(6) because:

        **this brief has been prepared in a proportionally spaced typeface using Corel WordPerfect XV in Times New Roman 14 point font**.

/S/ **Brian Shiffrin, Esq.**

(s)

Attorney for **PETITIONER-APPELLEE**

Dated: **1/20/12**